UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| TAMMY J. GOWINS, | CASE NO. 5:12CV1503 |
| Plaintiff, | MAGISTRATE JUDGE GEORGE J. LIMBERT |
| v. | |
| CAROLYN W. COLVIN[1], ACTING COMMISSIONER OF SOCIAL SECURITY, | MEMORANDUM OPINION AND ORDER |
| Defendant. | |

Tammy J. Gowins ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1.  For the following reasons, the undersigned REVERSES the ALJ's decision and REMANDS this matter to the ALJ for further evaluation and analysis of the treating physician's rule and Plaintiff's credibility, as well as to consider additional evidence previously offered solely to the Appeals Council.

**I.** **PROCEDURAL AND FACTUAL HISTORY**

On August 13, 2008 and August 25, 2008, respectively, Plaintiff applied for DIB and SSI, alleging disability beginning July 23, 2008.[2]  ECF Dkt. #11 ("Tr.") at 158-168.[3]  Plaintiff met the insured status requirements of the Social Security Act through December 31, 2009 ("DLI").  Tr. at

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2]Plaintiff's previous DIB application, in which she alleged disability beginning on December 1, 2003, was denied on July 22, 2008.

[3]References to the administrative record in this case refer to the ECF docket number of the cited document and the page number assigned to cited pleading by the ECF system, which can be found in the search box at the top of the page on the ECF toolbar.

20. The SSA denied Plaintiff's applications initially and on reconsideration. Tr. at 91-122. Plaintiff requested an administrative hearing, and on October 13, 2010, an ALJ conducted an administrative hearing, via videoconference, where Plaintiff testified and was represented by counsel. Tr. at 37-66. The ALJ also accepted the testimony of Hershel Goren, M.D., a medical expert ("M.E."), and Nancy Borgeson, a vocational expert ("V.E."). On December 9, 2010, the ALJ issued a Decision denying benefits. Tr. at 18-36. Plaintiff filed a request for review, which the Appeals Council denied on May 2, 2012. Tr. at 1.

On June 13, 2012, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On November 15, 2012, Plaintiff filed a brief on the merits. ECF Dkt. #14. On December 27, 2012, Defendant filed a brief on the merits. ECF Dkt. #16. A reply brief was filed on January 9, 2013. ECF Dkt. #17.

**II**.    **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff, who was forty-three years of age on the alleged onset date and forty-five years of age at the hearing, suffered from fibromyalgia, osteoarthritis and other similar disorders, and affective disorder, which qualified as severe impairments under 20 C.F.R. §404.1520(c) and 416.920(c). Tr. at 20.  The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§404.1520(d), 404.1525 and 404.1526, §416.920(d), 416.925 and 416.926 ("Listings"). Tr. at 21. The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. §404.1567(a) and 416.927, except that she requires low stress work with no production quotas and no temperature extremes, heights, or hazards.  Tr. at 24.

The ALJ ultimately concluded that, although Plaintiff could no longer perform her past work as a bartender, temporary laborer, or sewer (seamstress), there were jobs that existed in significant numbers in the national economy that the claimant can perform, including assembler, order clerk, office clerk, and cashier. Tr. at 27-28. As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

### III. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

### IV. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted).  An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).  The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).

**V.     ANALYSIS**

Plaintiff advances two arguments in this appeal. First, Plaintiff contends that the ALJ erred when he did not provide any citation to the record to support his decision to give little weight to the opinion of Plaintiff's treating physician, Ish Rawal, M.D. Second, Plaintiff contends that the case should be remanded to allow the ALJ to consider additional medical evidence generated after the administrative hearing in this case.

Plaintiff began treatment for her fibromyalgia on April 19, 2007 with Mark Pellegrino, M.D. Tr. at 350-51, 359-70. His medical notes reflect that Plaintiff complained of "pain all over for the past 20 years."  Tr. at 369.  Although she did not identify a precipitating event, she informed Dr. Pellegrino that her pain began when she was performing a job that required a lot of repetitive work. Tr. at 369.  She reported pain in all eighteen of the eighteen designated tender point regions.  Tr. at 369.

Fibromyalgia "is a medical condition marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.' " *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 n. 3 (6th Cir.2007) (quoting Stedman's Medical Dictionary for the Health Professions and Nursing at 541 (5th ed.2005)). Diagnosing fibromyalgia involves "observation of the characteristic tenderness in certain focal points, recognition of hallmark symptoms, and 'systematic' elimination of other diagnoses." *Rogers*, 486 F.3d at 244 (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir.1988)). CT scans, X-rays, and minor abnormalities "are not highly relevant in diagnosing [fibromyalgia] or its severity." *Id.*; see also *Preston*, 854 F.2d at 820. "[P]hysical examinations will

usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion". *Id.* at 818.

Plaintiff was prescribed Vicodin, which she claimed had "worked the best of all the pain medicines" and "improve[d] her quality of life." Tr. at 366. At Plaintiff's June 18, 2007 appointment, Dr. Pellegrino observed that the Vicodin was working well. Tr. at 366. Plaintiff underwent trigger point injections on August 20, 2007. Tr. at 365.

However, at her November 20, 2007 appointment, she reported that the injections did not alleviate her pain. Tr. at 363. At the time, she was prescribed Trazadone, Flexeril, and Vicodin. She stated that heat therapy, home stretches, and exercise helped to reduce her pain. At her February 20, 2008 appointment, Plaintiff described pain that was ten out of ten in intensity. Dr. Pellegrino prescribed physical therapy for Plaintiff's fibromyalgia flare-up, which he attributed to the cold weather as well as dental work[4] that had been done the previous month. Tr. at 362. He also prescribed Lyrica. At her June 3, 2008 appointment, Plaintiff told Dr. Pellegrino that she discontinued Lyrica because she did not tolerate it well. Tr. at 360. Plaintiff's pain was ten out of ten in intensity, and she informed Dr. Pellegrino that Vicodin was no longer alleviating her pain. Plaintiff was prescribed Morphine.

On July 24, 2008, Dr. Pellegrino observed that Plaintiff had increased and widespread pain in eighteen of eighteen designated tender point regions, and that she moved slowly and deliberately. Tr. at 359. Plaintiff described her pain as ten out of ten in intensity. Dr. Pellegrino discontinued Plaintiff's prescription for Morphine, which was ineffective and had a sedating effect, and prescribed Methadone.

An X-ray of the lumbar spine on August 2, 2008 was unremarkable, though correlation with MRI results was recommended. Tr. at 312, 315, 336. An MRI on August 4, 2008 showed mild disc disease at L5-S1 with minimal disc bulging, and mild degenerative change of the facet joints at L4-S1. Tr. at 314.

---

[4] Plaintiff had all of her upper teeth removed. Tr. at 362.

Dr. Pellegrino saw Plaintiff September 12, 2008 to address her complaints of neck pain and fibromyalgia. Tr. at 347, 357. Dr. Pellegrino noted cervical, trapezial, and other back pain on examination and ordered testing. A cervical x-ray on September 16, 2008 showed minimal encroachment of spurs on the neural foramina on the left and right of C3, C4, and C5. Tr. at 346, 374, 384.  On September 30, 2008 Arsal Ahmad, M.D. performed nerve conduction and electromyelogram studies of Plaintiff, which found no evidence of peripheral neuropathy or radiculopathy. Tr. at 343-45, 372-73, 381-83.

Plaintiff has treated with Dr. Rawal since August 9, 2007 for a variety of medical problems. Tr. at 415-17, 424-26, 438, 445-47. At her initial visit, Plaintiff reported C-spine spondylosis, bowel syndrome, colitis, fibromyalgia, hypertension, hypercholesterolemia, and arthritis.  Tr. at 446. Plaintiff estimated that she smoked two packs of cigarettes per week, and that she had smoked cigarettes for the past thirty years.  She was diagnosed with hypertension, hypercholesterolemia, fibromyalgia, abdominal pain, and gastritis  Tr. at 447.  At the time, she was prescribed Vicodin and Flexeril.  Tr. at 446.  On August 13, 2007, Plaintiff sought treatment for an enlarged liver and a black lesion on her lower lip. Tr. at 438. On September 18 and 24, 2007, Plaintiff sought treatment for dizziness, uneasiness, and tingling in her hands. She had recently been prescribed Effexor.  At a follow-up appointment on October 4, 2007, she still had complaints of dizziness.  Dr. Rawal prescribed a soft cervical collar, based upon a recent MRI of her cervical spine that revealed spondylosis bulging at the area of C5 and C6.  Tr. at 424.  On November 15, 2007, Plaintiff was treated for a urinary tract infection. Tr. at 417. At a December 11, 2007 appointment, Dr. Rawal noted his intent to prescribe Chantix and to refer Plaintiff to an obstetrician to address her hot flashes.  Tr. at 417.  On December 24, 2007, Plaintiff sought treatment for right shoulder pain and a lesion on her lower lip. Tr. at 415.  Dr. Rawal referred her to a dermatologist.  He noted his intent to x-ray Plaintiff's shoulder to rule out arthritis, and, if the x-ray is negative. to send Plaintiff for an MRI to rule out a rotator cuff injury.

At her April 24, 2008 appointment, Plaintiff complained of neck pain, numbness, and tingling in her hands. Tr. at 320.  Dr. Rawal referred her to an orthopedic specialist. On June 5, 2008, Plaintiff sought treatment for swelling in her legs. Tr. at 320.  Lasix was prescribed.  On July

03, 2008, Plaintiff complained of low back pain. She was given refills of her medications. Tr. at 319. At her August 13, 2008 appointment, Plaintiff told Dr. Rawal that she was prescribed Methadone for pain management, but that it was not alleviating her pain.

On January 2, 2009, Dr. Rawal completed a form titled Medical Opinion Re: Ability to do Work-Related Activities (Physical) for Plaintiff. Tr. at 274-76, 480-82. Dr. Rawal opined, among other things, that Plaintiff would be able to lift and carry less than ten pounds; stand and walk less than two hours in an eight-hour workday; sit less than two hours in an eight-hour workday; would need to shift position at will and lie down at unpredictable intervals; could occasionally crouch and climb stairs and never twist, stoop, or climb ladders; could have limited pushing/pulling; should avoid moderate exposure to high humidity, fumes, odors, dusts, gases, and perfumes and should avoid all exposure to temperature extremes and solvents or cleaners; and would miss work more than four days per month. Dr. Rawal based his opinion on findings of multifacet degenerative arthritis, third and fourth interspace neuroma, arthritis in knee, and "OA, DJD." He opined these limitations would date back to July, 2007. Tr. at 276.

State non-examining consultant Eli Perencevich, D.O. opined December 11, 2008 that Plaintiff retained the residual functional capacity for a range of medium exertional level work. Tr. at 466-73. On March 17, 2009 state non-examining consultant Myung Cho, M.D. affirmed the state's December 11, 2008 physical residual functional capacity. Tr. at 527.

Dr. Rawal saw Plaintiff again on February 27, 2009 for her low back pain. Tr. at 520. He refilled her medication and advised her to stay active and exercise as tolerated. On March 27, 2009, Dr. Rawal saw Plaintiff and noted she was scheduled to see a physician at the Cleveland Clinic for her back pain. Tr. at 520.

Plaintiff visited Tagreed M. Khalaf, M.D. at the Cleveland Clinic on April 1, 2009 for her fibromyalgia and low back pain. Tr. at 551-53. On examination, Dr. Khalaf noted reduced range of motion with pain on lumbar extension and diffuse pain in the cervical, thoracic, and lumbar spine. Tr. at 552. Dr. Khalaf diagnosed lumbar degenerative disc disease and facet arthropathy, with history of fibromyalgia. Tr. at 553.

An MRI on April 3, 2009 showed minimal bulging disc at L4-5; and bulging disc, facet arthropathy, and ligamentous hypertrophy resulting in minimal effacement of the anterior subarachnoid space, moderate left and mild right neural foraminal narrowing at L5-S1. Tr. at 555. On April 10, 2009 Dr. Pellegrino saw Plaintiff for follow-up, her pain averaging ten out of ten recently, with medicines reducing it to six to eight out of ten. Tr. at 528, 531, 682. Examination showed numerous painful areas including cervical, trapezial, scapular, sacroiliac, and lumbosacral, including cervical facet and lower lumbar facets.

At a follow-up appointment with Dr. Khalaf on April 24, 2009, Dr. Khalaf noted diffuse tenderness to palpation of the lumbar paraspinal muscles as well as the fibromyalgia tender points. (Tr. 559.) Dr. Khalaf found chronic low back pain, minimal lumbar degenerative disc disease, chronic bilateral whole lower-extremity pain mainly with walking and standing, and a history of fibromyalgia. Tr. at 560. He recommended pool therapy, Neurontin injections, and a neurology evaluation, though Plaintiff declined another round of injections. *Id.*

Dr. Khalaf saw Plaintiff on May 7, 2009 for a complaint of neck pain. Tr. at 566. Her subjective pain was eight out of ten. *Id.* On examination Dr. Khalaf found diffuse tenderness throughout the paraspinal musculature as well as fibromyalgia tender points. Tr. at 567. Cervical x-ray this date showed mild degenerative disc disease and facet disease at C3-C7. Tr. at 570, 585.

On May 13, 2009 Plaintiff saw Eric Baron, D.O., at the Cleveland Clinic Neurological Department for consultation for fibromyalgia and low back pain, on referral from Dr. Khalaf. Tr. at 574-78, 778-82. Dr. Baron found tenderness and hypertonicity of the lower cervical musculature and shoulders, and tenderness throughout the entire spin but especially the lumbar region. Tr. at 576. Motor and strength testing were normal, but sensory loss was noted in the arms and right foot. Tr. at 576-77. Dr. Baron suspected fibromyalgia was the primary process. Tr. at 578.

Dr. Pellegrino saw Plaintiff on July 10, 2009 and noted a more constant flare-up of pain, from six to eight out of ten, getting worse throughout the neck, back, and knees. Tr. at 681. Plaintiff complained of chronic inability to sleep and fatigue. On examination Dr. Pellegrino found pain in all eighteen designated tender point regions.

Plaintiff returned to Dr. Pellegrino on November 19, 2009. Tr. at 678. He noted Plaintiff had been having increased pain in her low back, radiating to the thoracic and rib areas, and still had difficulty moving around, using a cane for ambulation.  His examination revealed numerous painful areas more diffusely in the lumbar up to the lower thoracic regions, then into the side, ribs, and serratus regions bilaterally. Plaintiff's lumbar forward flexion was limited to thirty degrees, and thoracic rotation was decreased fifty percent. Dr. Pellegrino opined there were too many painful areas for trigger point injections and, because Plaintiff was allergic to Ketorolac, he recommended physical therapy. Dr. Pellegrino saw Plaintiff on February 18, 2010. Tr. at 677. He noted Plaintiff had done physical therapy and that it had helped to resolve her pain flare-up, though she continued to have pain all over, especially in her back, which could reach seven to eight out of ten in intensity. *Id.*

Plaintiff returned to Dr. Khalaf on March 26, 2010 with complaints of low-back and bilateral leg pain, worse with activity, with no mitigating positions. Tr. at 773-74. Examination showed diffuse paraspinal tenderness as well as tenderness in the fibromyalgia tender points. Tr. at 773. Dr. Khalaf found fibromyalgia, with history of chronic low back pain and bilateral leg pain, with lumbar spinal stenosis. Tr. at 774.

Dr. Pellegrino saw Plaintiff on May 19, 2010 and noted increased pain in the neck, back, and legs. Tr. at 737. Plaintiff ambulated with bilateral antalgia, and examination revealed diffuse pain in her legs and diffuse pain with palpation. Plaintiff reported to the emergency department at Mercy Medical Center on May 21, 2010 with complaints of leg and back pain. Tr. at 796-801, 844-49. Tests were normal, including venous duplex ultrasound of the legs. Tr. at 798, 849.

Plaintiff saw Achal Vaidya, M.D., on June 25, 2010 for rheumatology consultation. Tr. at 819-21. On examination Dr. Vaidya noted extreme muscle tenderness all over with eighteen out of eighteen tender points present; medial joint line tenderness in both knees; no synovitis; and tenderness along the spinal axis. Tr. at 820. She diagnosed severe fibromyalgia, osteoarthritis, cervical and lumbar spondylosis, and spinal stenosis. *Id.* She ordered tests and labs and concluded Plaintiff's problems "could be related to degenerative and soft tissue rheumatism such as fibromyalgia." Tr. at 821. Electrodiagnostic testing on July 20, 2010 was normal. Tr. at 745-48.

Plaintiff returned to Dr. Vaidya on July 22, 2010. Tr. at 817-18. Plaintiff was using a cane, and on examination Dr. Vaidya noted diffuse tenderness. Tr. at 818. Dr. Vaidya diagnosed vitamin D deficiency, severe fibromyalgia, osteoarthritis, cervical and lumbar spondylosis, and chronic pain.

At the hearing on October 13, 2010, Plaintiff testified that she has difficulty standing or sitting for periods of time. Tr. at 47.  Her feet swell quite often to the point that she cannot wear shoes. Tr. at 48.  She reduces the inflamation with a combination of moist heat, water pills, and elevation. She has psoriasis on the bottoms of her feet.  Plaintiff uses a cane, because walking "makes [her] legs feel like lead." Tr. at 48.  Standing still, on the other hand, causes her feet to swell and hurts her back.

She is able to shop for groceries once or twice a month, but relies upon the shopping cart for support, and her boyfriend's assistance at the cashier's counter.  Tr .at 49.  She performs some household chores, but must rest intermittently during each task.  Tr. at 50.  She no longer gardens (since a year prior to the hearing), rakes leaves, or shovels snow.  Tr. at 50-51.  She is able to dust and wash dishes.  Tr. at 52.

Plaintiff further testified that she "really can't do a lot" and that she has no source of enjoyment other than weekly or bi-weekly visits from her grandchildren. Tr. at 47, 53.  During their visits, she colors with them, watches movies, and reads to them.  Tr. at 47.  She watches television and does crossword puzzles, although her  daily chores, even though they are limited, cause fatigue. Tr. at 53.  When she gets tired, she experiences increased pain.  In order to alleviate pain, she rests from ten minutes to an hour approximately five times a day.  Tr. at 54.

Plaintiff has undergone spinal injections and trigger point injections to relieve her pain.  Tr. at 51.  She also undergoes therapy every year, including light physical therapy, massage therapy, and heat therapy, to the limits established by her insurance company (roughly twelve to fifteen visits). Tr .at 51.  The various therapy sessions alleviate Plaintiff's pain for a couple of hours following the session, but her pain returns.[5]

---

[5]Plaintiff stopped "pool therapy" because she suffers from recurrent infections, including yeast infections, urinary tract infections, and boils. Tr. at 52.

Plaintiff estimated that she is prescribed seventeen medications. Tr. at 54. She suffers side effects that include dizziness, nausea, blurred vision, hives, and sensitivity to the Sun. She testified that she cannot work because she is in constant pain, she has trouble sleeping so she is fatigued all day, and she cannot sit or stand for long periods of time. Tr. at 55.

At the hearing, the ME testified that Plaintiff suffered from major depressive disorder, generalized anxiety disorder, and fibromyalgia, which was originally diagnosed in April of 2007. Tr. at 55-56. Based upon the forgoing diagnoses, the ME opined that Plaintiff's only limitations were no high production quotas and no piecework. The ALJ specifically inquired, "So what you're telling me is basically no physical limitations?" The ME responded, "For the record I reviewed there is no reason for physical restrictions. More specifically the fibromyalgia [inaudible] should not be restricted in physical activities. She should be jogging if she wants to get rid of her fibromyalgia. She has to start an exercise program planning to build up to jogging." Tr. at 57. Plaintiff's counsel did not ask the ME any questions at the hearing.

In Plaintiff's first argument, she contends that the ALJ erred when he failed to provide any citation to medical evidence in concluding that controlling weight should not be given to the opinion of Plaintiff's treating physician, Dr. Rawal.The ALJ wrote:

> The record also contains a physical residual functional capacity assessment performed by one of [Plaintiff's] treating physicians, [Dr. Rawal], on January 2, 2009. According to Dr. Rawal, [Plaintiff] has multi-facet degenerative arthritis, third and fourth interspace neuroma and arthritis in her knee. Dr. Rawal indicated that the claimant is able to occasionally and frequently lift ten pounds and can sit, stand, and walk two out of eight hours per day. Dr. Rawal indicated that [Plaintiff] should never twist, stoop, kneel, crouch balance, or climb ladders. She should only occasionally crouch and climb stairs. Her ability to push and pull is affected by her impairments. Dr. Rawal indicated that [Plaintiff], due to her impairments and treatment, would likely average more than four missed days of work per week [sic]. (Ex. 16F). I give this opinion some weight, as I am convinced that [Plaintiff] has functional limitations that are greater than those limits proposed by DDS. However, I am not convinced that the record supports that [Plaintiff] has functional limitations that are as severe as stated by Dr. Rawal in his RFC assessment.

Tr. at 27.

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p,

-11-

1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544.  A presumption exists that the opinion of a treating physician is entitled to great deference.  *Id.*; *Rogers, supra*, at 243 (6th Cir. 2007).  If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors.  *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so.  SSR 96-2p.  The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*  This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore " 'be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied.' " *Wilson,* 378 F.3d at 544 quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999).  Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243, citing *Wilson*, 378 F.3d at 544.

Here, the ALJ wrote that he gave Dr. Rawal's opinion little weight because the ALJ was not "convinced that the record supports that [Plaintiff] has functional limitations that are as severe as stated by Dr. Rawal in his RFC assessment." Tr. at 27.  The ALJ offered no analysis to support his decision to give little weight to Dr. Rawal's opinion other than this single conclusory statement.

In the ALJ's summary of the medical evidence, he cited various test results to demonstrate a lack of objective evidence in the record supporting Plaintiff's allegations of debilitating pain. However, "[o]pinions that focus solely upon objective evidence are not particularly relevant" due to the "the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia." *Rogers*, 486 F.3d at 245. Simply stated, the ALJ has failed to provide reasons for rejecting Dr. Rawal's opinion that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p.

Of equal concern, cases involving fibromyalgia "place[ ] a premium . . . on the assessment of the claimant's credibility." *Swain*, 297 F.Supp.2d at 990. This is because "unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs." *Rogers*, 486 F.3d at 243. "Nonetheless, a diagnosis of fibromyalgia does not automatically entitle [a claimant] to disability benefits ...." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir.2008) (emphasis in original). Accordingly, in cases involving fibromyalgia an ALJ must assess Plaintiff's credibility[6] and "decide ... if the claimant's pain is so severe as to impose limitations rendering her disabled." *Swain*, 297 F.Supp.2d at 990. Here, the ALJ provided no explanation for his decision to reject Plaintiff's testimony at the hearing.

Because this matter must be remanded for further analysis of the treating physician rule and Plaintiff's credibility, the undersigned further finds that the ALJ should consider the additional evidence previously offered solely to the Appeals Council. The ALJ predicated his opinion regarding disability on the fact that Plaintiff had never undergone surgery to alleviate her back and neck pain. Tr. at 26.

---

[6]The Sixth Circuit has recognized that "disability claims related to fibromyalgia are related to the symptoms associated with the condition – including complaints of pain, stiffness, fatigue, and inability to concentrate– rather than the underlying condition itself." *Rogers*, 486 F.2d at 247, citing 20 C.F.R. § 419.929; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 686 (6th Cir. 1992)(subjective complaints of pain may support a disability claim). Further, "given the nature of fibromyalgia, where subjective complaints play an important role in the diagnosis and treatment of the condition, providing justification for discounting a claimant's statements is particularly important." *Rogers*, 486 F.2d at 248.

### **VI.   CONCLUSION**

For the foregoing reasons, the decision of the ALJ is REVERSED and this matter is REMANDED for reevaluation and further analysis of the treating physician's rule and Plaintiff's credibility, as well as consideration of the evidence previously offered solely to the Appeals Council.

DATE: September 11, 2013

           */s/George J. Limbert*
           GEORGE J. LIMBERT
           UNITED STATES MAGISTRATE JUDGE